UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| COLUMBIA CROSSING, L.L.C., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 07-cv-636-JPG |
| | ) | |
| CITY OF COLUMBIA, ILLINOIS a | ) | |
| Municipal Corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter comes before the Court on the Motion for Summary Judgment filed by

defendant City of Columbia ("City") (Doc. 31).  Plaintiff Columbia Crossing, L.L.C. ("CC") has

responded to the motion (Doc. 41) and the City has replied to that response (Doc. 46).  CC has

requested a hearing on the motion for summary judgment (Doc. 45).  The City has also filed a

motion to strike certain material from CC's response to the summary judgment motion (Doc.

47).  CC has responded to the motion to strike (Doc. 48), and the City has replied to that

response (Doc. 49).

## I.      Motion to Strike (Doc. 47)

In this motion, the City asks the Court to strike certain statements in CC's response to the

summary judgment motion on the grounds that the matters are irrelevant or unsupported by any

evidence and would confuse the Court.  CC contends that the statements in issue are relevant and

well-supported.

There is no need to strike any material from CC's response brief.  The Court has sifted

through the statements in the brief and considered only the relevant and well-supported matters.

It was not confused by the presence of any irrelevant or unsupported statements. The Court will therefore deny the City's motion to strike.

## II.     Motion for Summary Judgment (Doc. 31)

Summary judgment is appropriate where "the pleadings, the discovery and disclosed materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Spath v. Hayes Wheels Int'l-Ind., Inc.*, 211 F.3d 392, 396 (7th Cir. 2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008); *Spath*, 211 F.3d at 396.

In this contract case, there is no real dispute over the relevant facts. The parties agree that a contract was executed, and the contract language speaks for itself. The parties disagree, however, whether as a matter of law the contract is void and unenforceable. Because the Court can decide these matters based on the filings alone, it will deny CC's motion for a hearing (Doc. 45).

### A.     Facts

The City is an Illinois municipal corporation that does not possess the powers of home rule. CC (actually, its affiliate G.J. Grewe, Inc., but that detail is unimportant to this case) is a developer who wanted to develop some agricultural land it owned in the City into a mixed use area that would be served by a proposed new interchange off of Interstate 255. There is no novelty in the relationship between the City and CC. The City wanted financial assistance in obtaining a new interstate interchange it could not afford to itself, more tax revenue that would

2

be generated by development near the interchange, and public improvements to the development area;  CC wanted to make money by developing its land near the proposed interchange.  It had immediate access to financial resources to use for the interchange as well as the development project and the infrastructure necessary to support it, but it needed the City's assistance to obtain other long-term financial assistance and appropriate zoning.

In 2004, after years of negotiating, the City and CC agreed to the terms of a Master Development Agreement ("MDA").  The MDA is a complex development agreement between CC and the City under which, in a nutshell, the City would pay some costs necessary for the redevelopment project and would reimburse CC for other costs CC would pay out of funding sources that would be available as a result of the project (e.g., grants, tax increment financing mechanisms, special service taxes and other "economic incentives").  Specifically, the City agreed to "reasonably cooperate in good faith" with CC to do a number of things:  obtain funding for the development, necessary government approvals and cost cutting devices (§ 3.1); establish taxable special service areas (§ 3.3); implement sales tax rebate incentive agreements (§ 3.4); create tax increment financing ("TIF") districts and execute TIF development agreements (§ 3.5); create special purpose districts where sales tax rebates could be obtained and implement other taxes (§ 3.6); identify and apply for other sources of government funding (§ 3.7); implement a utility cost recoupment program (§ 3.8); obtain other incentives or credentials helpful in generating revenue (§ 3.9); obtain economic incentives and zoning changes (§ 3.14); obtain expedited government approvals (§ 4.1); amend the existing zoning ordinance and finalize a development agreement with CC (§ 4.2); develop and implement a concept development plan (§ 4.3); and expedite the issuance of building permits (§ 4.4).  The City also agreed to use its eminent domain power to acquire portions of the development area (§ 5.2) and to pursue in good

faith approval of the proposed interstate exchange (§ 6.5).  In most of those efforts, the City agreed to cooperate "subject to any limitations, requirements or duties imposed by law."  (§§ 3.1, 3.3, 3.4, 3.5, 3.6, 3.8, 4.2, 4.4 and 5.2).  In some instances, it also agreed to be limited by the development area's ability to actually qualify for the status the City agreed to cooperate in seeking (§§ 3.1 and 3.5).

In addition, the City promised to initiate rezoning to a mixed use area, diligently pursue the rezoning process and use its reasonable best efforts to adopt and enforce a mixed use rezoning ordinance, keeping in mind CC's needs but at the same time exercising its municipal discretion.  The MDA also contains a severability clause providing that if any term is held to be unenforceable, "the remainder shall continue in full force and effect, to the extent the remainder can be given effect without the invalid provision."  (§ 6.10).

On July 6, 2004, the City Council passed Ordinance 2275 authorizing the City's mayor to execute the MDA on behalf of the City, and he did so the very same day.  Ordinance 2275 notes the City's past unsuccessful attempts to obtain an interstate interchange and its then-existing cooperation with CC in efforts that looked more promising.  It did not refer in any way to blight or deterioration of any part of the City.

CC and the City worked cooperatively under the MDA until April 2007, at which time there was substantial turnover in the composition of the City Council.  Those in favor of the development were ousted, and those opposed to the development were elected.

The MDA was not performed in full by September 2007, when CC filed this lawsuit alleging the City was not living up to its end of the bargain in a number of respects.  It asserts causes of action for breach of contract, anticipatory repudiation and specific performance.  The City now asks for summary judgment, claiming the MDA is void and unenforceable because (1)

4

the City's passage of the ordinance authorizing the MDA was *ultra vires*, (2) the MDA contains an unlawful promise to zone in a certain way and (3) the MDA impermissibly usurps the legislative function of future City Councils.

B.    Analysis

The City claims that Ordinance 2275 authorizing and directing the City's mayor to execute the MDA was *ultra vires*, that is, beyond its authority as a non-home-rule Illinois municipality.  On the other side, CC finds authority in the Illinois Municipal Code and in the Illinois Constitution for the City to enter into the MDA.  The resolution of this issue turns on the authority of non-home-rule municipalities.

Municipalities that do not possess the power of home rule, either because they are not populous enough or because they have not voted to become a home rule unit, have only the powers granted to them by the Illinois Constitution or statutes.[1]  *Pesticide Public Policy Found. v. Village of Wauconda,* 510 N.E.2d 858, 860 (Ill. 1987).  Non-home-rule municipalities have no inherent powers.  *Hawthorne v. Village of Olympia Fields*, 790 N.E.2d 832, 840 (Ill. 2003).

The Illinois Constitution gives non-home-rule municipalities six enumerated powers:

> (1) the power to make local improvements by special assessments; (2-4) the power, through referendum, to adopt, alter or repeal their forms of government and to provide for "their officers, manner of selection and terms of office"; and (5-6) the power to incur debt and to levy or impose additional taxes, subject to certain exceptions and limitations. Ill. Const. 1970, art. VII, § 7.

*Hawthorne*, 790 N.E.2d at 840.  It further allows them other "powers granted to them by law," Ill. Const. 1970, art. VII, § 7, that is, powers conferred on them either expressly or impliedly by statute.  *Hawthorne*, 790 N.E.2d at 840.  In sum, non-home-rule municipalities "possess only

---

[1]This principle is known as "Dillon's Rule" because it is found in a famous treatise on municipal corporations, 1 J. Dillon, *Municipal Corporations* § 237 at 448 (5th ed. 1911).

those powers expressly granted, powers incident to those expressly granted, and powers indispensable to the accomplishment of the declared objects and purposes of the municipal corporation." *Pesticide Public Policy Found.,* 510 N.E.2d at 861; *accord People ex rel Ryan v. Village of Hanover Park*, 724 N.E.2d 132, 138 (Ill. App. Ct. 1999).

Grants of powers to municipalities are to be strictly construed, and where there is doubt as to the existence of a power, the doubt must be resolved against the municipality. *Pesticide Public Policy Found.,* 510 N.E.2d at 861; *Melbourne Corp. v. Chicago Hearing Bd. for Nursing Homes*, 322 N.E.2d 481, 484 (Ill. 1974); *Fischer v. Brombolich*, 566 N.E.2d 785, 788 (Ill. App. Ct. 1991). Even when a non-home-rule municipality has been granted certain powers, it may not exercise those powers in a manner contrary to the spirit of state law or repugnant to the general policy of the state of Illinois. *Hawthorne*, 790 N.E.2d at 842; *Hanover Park*, 724 N.E.2d at 138-39.

Ordinances enacted without authority are *ultra vires* and void. *McGovern v. City of Chicago*, 118 N.E. 3, 10 (Ill. 1917). However, ordinances are presumed valid, and the party challenging the validity of an ordinance bears the burden of proof. *Geneva Residential Ass'n v. City of Geneva*, 397 N.E.2d 849, 859 (Ill. App. Ct. 1979).

In this case, the City argues it did not have the authority to enter into the MDA because neither the Illinois Constitution nor any Illinois statute authorizes entry into comprehensive development agreements. Indeed, commercial development is not indispensable to the purposes of the City. Therefore, CC must point to a statute which expressly or impliedly authorized the City to enact the ordinance directing the City to enter into the MDA.

CC argues that each obligation included in the MDA is either expressly or impliedly authorized by the Illinois Constitution or state law. Specifically, it cites 65 ILCS 5/2-2-12 in

support of the proposition that Illinois municipalities may enter into contracts generally.[2]  It

further argues that the Illinois Constitution and the Illinois Municipal Code grant municipalities

broad authority to implement development.  In support of this proposition, CC points to 65 ILCS

5/8-11-20,[3] which authorizes municipalities to "enter into economic incentive agreements

relating to the development or redevelopment of land within the corporate limits of the

municipality," and to 65 ILCS 5/11-74.4-1 *et seq.*,[4] the Tax Increment Allocation

---

[2]65 ILCS 5/2-2-12 states:

Cities incorporated under this Code shall be bodies politic and corporate under the name of "City of (name)," and under that name may sue and be sued, *contract and be contracted with*, acquire and hold real and personal property for corporate purposes, have a corporate seal, changeable at pleasure, and exercise all the powers hereinafter conferred.

(emphasis added).

[3]65 ILCS 5/8-11-20 provides, in pertinent part:

Economic incentive agreements.  The corporate authorities of a municipality may enter into an economic incentive agreement relating to the development or redevelopment of land within the corporate limits of the municipality. Under this agreement, the municipality may agree to share or rebate a portion of any retailers' occupation taxes received by the municipality that were generated by the development or redevelopment over a finite period of time. . . . .

[4]The version of 65 ILCS 5/11-74.4-4 in place when the City entered into the MDA provided, in pertinent part:

A municipality may:

* * *

(b) Make and enter into all contracts with property owners, developers, tenants, overlapping taxing bodies, and others necessary or incidental to the implementation and furtherance of its redevelopment plan and project. . . . .

* * *

Redevelopment Act ("TIF Act"). CC also points to 65 ILCS 5/9-5-1,[5] which allows municipalities to contract to reimburse developers for their costs in constructing certain improvements that benefit those outside the development area.

(h) Accept grants, guarantees and donations of property, labor, or other things of value from a public or private source for use within a project redevelopment area.

(c) Within a redevelopment project area, acquire by purchase, donation, lease or eminent domain . . . in the manner and at such price the municipality determines is reasonably necessary to achieve the objectives of the redevelopment plan and project. . . .

* * *

(j) Incur project redevelopment costs and reimburse developers who incur redevelopment project costs authorized by a redevelopment agreement. . . .

* * *

(m) Exercise any and all other powers necessary to effectuate the purposes of this Act.

The TIF Act also provides, "Obligations . . . may be issued to provide for redevelopment project costs. . . .,"  65 ILCS 5/11-74.4-7, and "A municipality . . . may adopt tax increment allocation financing . . ."65 ILCS 5/11-74.4-8.

[5]65 ILCS 5/9-5-1 provides, in pertinent part:

Whenever a municipal ordinance . . . requires the installation of water mains, sanitary sewers, drains, or other facilities for sewers and drains, the construction of any roadways, or the installation of any traffic signals or other traffic related improvements . . . and where, in the opinion of the corporate authorities, the facilities, roadways, or improvements may be used for the benefit of property not in the subdivision or planned unit development or outside the property for which a building permit has been issued, and the water mains, sanitary sewers, drains, or other facilities, roadways, or improvements are to be dedicated to the public, the corporate authorities may by contract with the subdivider or permittee agree to reimburse and may reimburse the subdivider or permittee for a portion of the cost of the facilities, roadways, and improvements from fees charged to owners of property not within the subdivision, planned unit development, or property for which a building permit has been issued when and as collected from the owners.

In addition, CC cites Article VII, Section 7 of the Illinois Constitution[6] and the Special Service Area Tax Law, 35 ILCS 200/27-10,[7] as authority to levy or impose property taxes for special services.  It also cites the zoning division of the Illinois Municipal Code, 65 ILCS 5/11-13-1, *et seq.*, as authority to agree to the rezoning agreements in the MDA.[8]  CC further notes that the City has not identified any Illinois statute or policy with which the MDA conflicts.

In reply, the City argues that the MDA impermissibly binds the City to enter into future contracts without ensuring that the various prerequisites of the cited statutory authority for economic incentive and zoning agreements are satisfied and without containing the statutorily required terms of such agreements.  Apparently, the typical order of development projects is to satisfy the statutory requirements for obtaining the zoning changes, the TIF districts and certain

---

[6]The Illinois Constitution states, "Counties and municipalities which are not home rule units shall have . . . the powers . . . (6) to levy or impose additional taxes upon areas within their boundaries in the manner provided by law for the provision of special services to those areas and for the payment of debt incurred in order to provide those special services."  Ill. Const. art. VII § 7(6).

[7]The Special Service Area Tax Law states, "In any case in which a municipality or county exercises the power granted in item (6) of Section 7 of Article VII of the Illinois Constitution . . . . to provide special services, a tax to provide those special services or provide for the payment of debt incurred for that purpose shall be levied or imposed in accordance with this Article."  35 ILCS 200/27-10.

[8]The version of 65 ILCS 5/11-13-1 in place when the City entered into the MDA provides that a municipality has, among other zoning powers, the power

(5) to divide the entire municipality into districts of such number, shape, area, and of such different classes (according to use of land and buildings, height and bulk of buildings, intensity of the use of lot area, area of open spaces, or other classification) as may be deemed best suited to carry out the purposes of this Division 13. . . .

other economic incentives and achieve those goals before executing a master development agreement that depends on them.

After reviewing the proffered statutory and constitutional authority for the City's entry into the MDA, the Court concludes that the City has acted *ultra vires*. The first proffered source for the City's power to enter into the MDA is 65 ILCS 5/2-2-12. However, that statute sets forth the capacity of a municipality to "contract and be contracted with," but it does not authorize a municipality to make any and all contracts it desires. Examples of invalidated municipal contracts demonstrate that 65 ILCS 5/2-2-12 is not so broad. *See, e.g., Elk Grove Twp. Rural Fire Protection Dist. v. Village of Mount Prospect*, 592 N.E.2d 549 (Ill. App. Ct. 1992) (invalidating an agreement to assess the maximum tax rate allowable by law for a ten year period). The contracts a municipality enters into must be authorized by some additional authority.

The most likely candidates for this additional authority appear to be 65 ILCS 5/8-11-20 and the TIF Act, 65 ILCS 5/11-74.4-4. Both statutes broadly grant a municipality the authority to enter into contracts relating to development or redevelopment. A closer look, however, reveals that the authority granted under those statutes is limited by conditions the municipality must meet before the contracting authority can be exercised. For example, 65 ILCS 5/8-11-20 allows a municipality to "enter into an economic incentive agreement relating to the development or redevelopment of land within the corporate limits of the municipality," but it requires the municipality to make certain findings "[b]efore entering into the agreement authorized by this Section." 65 ILCS 5/8-11-20(1)-(9). In this case, the City did not make those findings before entering into the MDA. Therefore 65 ILCS 5/8-11-20 does not provide authority for the City to enter into the MDA.

Similarly, the TIF Act allows a municipality to "[m]ake and enter into all contracts with . . . developers . . . necessary or incidental to the implementation and furtherance of its redevelopment plan and project," 65 ILCS 5/11-74.4-4(b), and to "[e]xercise any and all other powers necessary to effectuate the purposes of this Act," 65 ILCS 5/11-74.4-4(m).  However, the TIF Act also defines a "redevelopment plan" as

> the comprehensive program of the municipality for development or redevelopment intended by the payment of redevelopment project costs to reduce or eliminate those conditions the existence of which qualified the redevelopment project area as a "blighted area" or "conservation area" or combination thereof or "industrial park conservation area," and thereby to enhance the tax bases of the taxing districts which extend into the redevelopment project area. . . .

65 ILCS 5/11-74.4-3(n).  In turn, the TIF Act sets forth certain criteria before an area can be considered a "blighted area," "conservation area," or "industrial park conservation area."  65 ILCS 5/11-74.4-3(a), (b) & (d).  No facts show that the MDA's development area contains any area that qualified under the TIF Act as a blighted area, conservation area or industrial conservation area, that the City has adopted a "comprehensive program" to remedy blighted areas, conservation areas or industrial park conservation areas or that the City's entry into the MDA was "necessary or incidental to the implementation and furtherance" of such a comprehensive program.  On the contrary, Ordinance 2275 indicates that the City's overriding purpose of entering into the MDA was to obtain an interstate interchange, not to reduce or eliminate blighted or conservation areas.  In the absence of any stated purpose or findings to support application of the TIF Act, the City cannot purport to act under that statute to enter into the MDA.

It is true that the MDA indicates the City will cooperate only to the extent permitted by law, which may be construed to be a promise that the necessary findings will be made and

purposes adopted before further economic incentive agreements will be made under the authority of 65 ILCS 5/8-11-20 or before development agreements will be made or TIF Districts will be created under the authority of the TIF Act, 65 ILCS 5/11-74.4-4. Nevertheless, absent those findings and adopted purposes, neither statute can authorize the MDA itself.

CC also cites other statutes that authorize a municipality to reimburse developers for required public improvements that benefit those outside the development area, 65 ILCS 5/9-5-1, to impose taxes for special service areas to repay the costs of providing those special services, Ill. Const. art. VII, § 7(6), 35 ILCS 200/27-10, and to implement zoning, 65 ILCS 5/11-13-1, *et seq*. While these laws may provide authority for the City to enter into certain isolated provisions of the MDA – and the Court makes no finding that they actually do provide such authority – they do not authorize the key development provisions of the MDA: the promises to reasonably cooperate in good faith to move forward with the overall development project, to reimburse CC for its costs, to seek a variety of economic incentives and approvals to assist in reimbursing CC for its costs and to obtain the required land acquisition, zoning and TIF districts.

The Court now turns to the question of whether the potentially valid portions of the MDA can be saved by the severability clause in § 6.10, which provides that the remaining provisions shall be effective to the extent they can be without the invalid provisions. A severability clause can save a contract where the invalid provisions are not essential to the overall agreement. *See People ex rel. Foreman v. Village of Round Lake Park*, 525 N.E.2d 868, 875 (Ill. App. Ct. 1988) ("Courts which will enforce a contract with a portion severed generally do so when the severed portion does not go to the contract's essence."). Here, however, the provisions cited in the foregoing paragraph and found to be unenforceable are the essence of the MDA; the MDA is meaningless without them. For this reason, the severability clause will not save the MDA.

In sum, because there is no express or implied authority in the Illinois Constitution or Illinois statutes allowing the City to enter into the MDA, Ordinance 2275 authorizing the City to do so was *ultra vires* and void. The City is entitled to summary judgment. In light of this ruling, the Court need not consider the City's other arguments for why it should not be bound by the MDA.

### III.    Conclusion

For the foregoing reasons, the Court:

•    **DENIES** the City's motion to strike (Doc. 47);

•    **DENIES** CC's motion for a hearing (Doc. 45);

•    **GRANTS** the City's motion for summary judgment (Doc. 31);  and

•    **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**
**DATED:  July 24, 2008**

s/ J. Phil Gilbert
**UNITED STATES DISTRICT JUDGE**